776 So.2d 519 (2000)
Noah Elton ROBERTS
v.
STATE of Louisiana.
No. 00-778.
Court of Appeal of Louisiana, Third Circuit.
November 2, 2000.
Writ Denied February 2, 2001.
*520 Howard Nugent, Jr., Alexandria, LA, Counsel for Plaintiff/Appellant.
Victoria Reed Murry, Alexandria, LA, Counsel for Defendant/Appellee.
Dee D. Drell, Alexandria, LA, Counsel for Intervenor.
(Court composed of BILLIE COLOMBARO WOODARD, MARC T. AMY, and MICHAEL G. SULLIVAN, Judges.)
*521 SULLIVAN, Judge.
Noah Roberts, a computer repairman, injured himself while on assignment at the State of Louisiana, Office of Community Services in Alexandria, Louisiana. He and his wife, Patsy, appeal the judgment of the trial court which awarded him damages totaling $64,703.45, and assessed him with fifty-seven percent fault. The State of Louisiana appeals the jury's determination that it was at fault. For the following reasons, we amend in part, affirm in part, reverse in part, and render.

Facts
On September 6, 1995, Mr. Roberts was employed by Memorex Telex Corporation. Memorex contracted with the State of Louisiana, Department of Social Services, Office of Community Services (OCS), to provide computer repair and technical services to OCS at its Alexandria office. Mr. Roberts began providing repair services to the office in approximately 1993. In 1990, OCS had purchased computer workstations for ten to twelve of its thirty-two employees. The workstations had a flat desktop with an open hutch on the back portion of the desktop. The hutch was divided into two sections which housed movable shelves. The shelves were placed on metal pins that were inserted into predrilled holes on the vertical sides of each section of the hutch.
On September 6, 1995, Mr. Roberts went to OCS to replace a computer processing unit (CPU) for Ms. Sharon Turner, an OCS employee. Ms. Turner's CPU was situated on one of the movable shelves of her workstation. In order to replace the CPU, Mr. Roberts had to disconnect cables for the computer components that were plugged into the rear of the CPU. The CPU was larger than the shelf and extended over the front and rear edges of the shelf. To access the cables, Mr. Roberts picked up the CPU and began moving it forward. As he did so, the shelf moved forward with the CPU, and the shelf and CPU became unbalanced. The movement of the shelf and the CPU caused Mr. Roberts to become unsteady on his feet. At the same time, books and "whatever" on the station started falling. Mr. Roberts stepped backward to keep from getting hit on the head by items falling from the workstation. He struggled to control the CPU but could not. He stumbled, fell backward, and landed in a sitting position on the floor. During his fall, his buttocks hit the edge of a leg of Ms. Turner's chair.
No one witnessed the accident. Shortly after the accident, Ms. Turner and other employees of the office went to see what had occurred. Mr. Roberts testified that when Ms. Turner saw him sitting on the floor she stated: "I knew this was going to happen." However, Ms. Turner denied making the comment.
Mr. Roberts could not continue with his work and drove to his mother's home to rest. After resting a while, he determined that he could not drive himself home and called his wife to pick him up. After his fall, Mr. Roberts had pain in his neck and back. On September 7, 1995, he sought medical treatment from Dr. Allen Redding in Columbia. He saw Dr. Redding on approximately four occasions.
On September 27, 1995, Mr. Roberts saw Dr. Meril Dufrene, a chiropractor, complaining with neck pain, upper back pain, mainly on the right side, right arm pain, low back pain and spasm, headaches, and right hip pain. During this time, he also saw Dr. Mark O'Pereo who hospitalized him at Caldwell Memorial Hospital. Dr. Dufrene treated Mr. Roberts conservatively. During Dr. Dufrene's treatment, Mr. Roberts' did not show much improvement; his complaints would wax and wane. Dr. Dufrene referred him to Dr. John Weiss, an orthopedic surgeon in Alexandria.
On November 29, 1995, Mr. Roberts had his first appointment with Dr. Weiss. He complained of headaches which occurred almost every day, as well as pain in his neck and back. He related that he previously had a tingling sensation in his *522 right index finger which had cleared by his first visit with Dr. Weiss. Early in his treatment with Dr. Weiss, Mr. Roberts complained of almost constant pain in his neck. Testing revealed a small focal herniation at C4-5 in his neck; however, Dr. Weiss thought Mr. Roberts' neck problems were probably facet arthritis. He prescribed cervical traction and prescription medications for pain. By May 1996, Mr. Roberts' neck felt fine; he no longer complained of pain in his neck.
Dr. Weiss ordered a lumbar CT scan, which revealed a wide postero-lateral herniation with a moderate bulge at L4-5. According to Dr. Weiss, the herniation could cause pressure on the L4 or L5 nerve roots. Physical therapy was prescribed for Mr. Roberts' back. However, in March Dr. Weiss stopped the physical therapy and had Mr. Roberts walk one mile a day. In April, Mr. Roberts complained of low back pain at a level of five to six on a scale of one to ten. He reported that the pain was severe after walking or sitting. Dr. Weiss re-instituted physical therapy at that time.
Then in May, Mr. Roberts reported numbness in his right foot, intermittent pain in his low back, and pain in his right leg. He also reported that he could only walk about three-fourths of a mile without having to stop and rest. He complained of pain on bending, and also with prolonged sitting or standing. Dr. Weiss thought Mr. Roberts needed a more thorough surgical evaluation because, in his opinion, the broad-based herniation in his back was giving him more and more problems. He referred Mr. Roberts to another neurosurgeon because he no longer performed surgery.
On July 7, 1996, Mr. Roberts saw Dr. John Jackson, a neurosurgeon in New Orleans. Dr. Jackson did not feel that Mr. Roberts was a candidate for immediate surgery. He informed him that he was a candidate for a partial hemilaminectomy on the left at L4-5 with removal of the ruptured disc and decompression of the nerve root and a foraminatomy, if his pain reached a point where he could not tolerate it. Dr. Jackson, as well as Dr. Weiss, was of the opinion that the fall, as described by Mr. Roberts, was enough to cause the herniation at L4-5. As of the trial, Mr. Roberts wanted to have surgery but it had not been approved by his employer's workers' compensation insurer.
After his injury, Mr. Roberts, on order of his physicians, was unable to return to work. He did not perform any work between the accident and the trial. His wife had to go to work due to his inability to work. His injuries affected not only his ability to work, but also his enjoyment of other activities, like fishing and hunting, that he previously enjoyed. He became depressed because he could not work and because Mrs. Roberts had to go to work. This had a negative effect on his relationship with her. Mr. Roberts testified that he felt useless. The Roberts had separated in 1992; Mr. Roberts testified that they were separated only two days and that after the separation their relationship was good and loving until the accident. Mr. and Mrs. Roberts testified that the accident strained their relationship. Their sexual relationship was negatively affected. On occasion, Mr. Roberts was impotent. He related that some of his medications could cause impotence. The Roberts separated on two occasions after the accident.
The Roberts sued the State of Louisiana, through the Department of Social Services for damages they sustained as a result of Mr. Roberts' injuries. Mr. Roberts' employer's workers' compensation carrier intervened to recover indemnity and medical benefits that it paid to Mr. Roberts as a result of his injuries. The case was presented to a jury on March 10 and 11, 1998. At the conclusion of the trial, the jury determined that the computer workstation was unreasonably dangerous and awarded Mr. Roberts $10,000.00 for past and present physical pain and suffering, $23,000.00 for past loss of income and earning capacity, $1,000.00 for *523 future physical pain and suffering, $4,500.00 for future loss of income of earning capacity, and $13,000.00 for future medical expenses. No award was made to Mrs. Roberts for her loss of consortium claim. The jury assessed Mr. Roberts with fifty-seven percent fault. The Roberts filed a motion for judgment notwithstanding the verdict on the following issues: damages awarded to Mr. Roberts, Mrs. Roberts' loss of consortium claim, and the assessment of fault to Mr. Roberts. The trial court granted the JNOV only as to the past medical expenses, which were the subject of a stipulation, increasing the award to the stipulated amount of $13,203.45. The Roberts appeal, seeking an increase in the damage awards to Mr. Roberts, an award for loss of consortium for Mrs. Roberts, and a reduction in the apportionment of fault to Mr. Roberts. The State of Louisiana appeals the judgment, seeking a reversal of the jury's finding of liability on the basis that the workstation did not present an unreasonable risk of harm.

Standard of Review
A jury's finding of fact may not be reversed absent manifest error or unless it is clearly wrong. Stobart v. State, through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead "review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous." Id. at 882. The issue to be resolved on review is whether the fact finder's conclusion was a reasonable one, not whether it was right or wrong. "[T]he reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Id. at 882-83, citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990)).

Unreasonable Risk of Harm
The State of Louisiana appeals the jury's determination that the computer station with the movable shelf presented an unreasonable risk of harm to Mr. Roberts. Mr. and Mrs. Roberts proceeded against the State under a theory of negligence, based on La.Civ.Code art. 2315, and a theory of strict liability, based on La.Civ. Code art. 2317 and La.R.S. 9:2800. Under either theory, a plaintiffs burden of proof is the same:
[T]he plaintiff bears the burden of showing that:
(1) [the State] had custody of the thing that caused the plaintiffs injuries or damages;
(2) the thing was defective because it had a condition that created an unreasonable risk of harm;
(3) [the State] had actual or constructive knowledge of the defect and failed to take corrective measures within a reasonable time; and
(4) the defect in the thing was a cause-in-fact of the plaintiffs injuries.

Brown v. Louisiana Indem. Co., 97-1344 (La.3/4/98), 707 So.2d 1240, 1242; Lee v. State, Through Dep't of Transp. & Dev., 97-0350 (La.10/21/97), 701 So.2d 676, 677-78. To recover, plaintiff bears the burden of proving all these inquiries in the affirmative and failure on any one is fatal to the case.
Netecke v. State, through DOTD, 99-1182, 98-1197, p. 7 (La.10/19/99); 747 So.2d 489, 494. The State contests the jury's determination that the computer workstation presented an unreasonable risk of harm to Mr. Roberts. It does not contest Mr. Roberts' proof of the other three elements of his claim against the State. Accordingly, we only address the jury's finding that the workstation presented an unreasonable risk of harm to Mr. Roberts.
*524 "[W]hether a defect presents an unreasonable risk of harm `is a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts.'" Brunet v. State, 97-1695, p. 5 (La.App. 3 Cir. 6/10/98); 715 So.2d 560, 562 (citations omitted). "[D]etermination of whether a risk is unreasonable is personal to the particular plaintiff." Celestine v. Union Oil Co. of Cal., 94-1868, p. 8 (La.4/10/95); 652 So.2d 1299, 1304. Therefore, to determine whether a particular risk of harm is unreasonable the particular individual and the circumstances surrounding the incident in question must be considered.
In Celestine, the court identified several factors to be considered in determining whether a risk was unreasonable to a repairman who was injured by the condition that he was hired to repair:
[T]he individual circumstances, including but not limited to the social, moral, economic considerations, the degree of knowledge of the repairman, the incentive or disincentive to the owner to repair the vice or defect, the reasonableness of presuming that a particular repairman is cognizant of the particular risks, and the ability of the repairmen [sic] to minimize such risks, should all be factored into and weighed in the "unreasonable risk" calculation.
Id. at 1304.
Mrs. Patricia Johnson, supervisor of the OCS department, testified that the computer workstations bought in 1990 had movable shelves but other workstations in the department did not have movable shelves. She also testified that Mr. Roberts had not been warned that some of the workstations had movable shelves. Further, she testified that some of the movable shelves had been immobilized with screws or nails. Mr. Kenneth Sayes of United Office Supply sold the workstations to OCS and assembled the stations for the department. He testified that in his opinion the CPU was too heavy and too large to be placed on the movable shelves. He and Mr. Roberts both testified that the CPU could have been placed on the desktop under Ms. Turner's monitor. This was undisputed.
Mr. Roberts testified that because of the general disarray of Ms. Turner's workstation, he felt that he could not move the workstation forward to access the rear of the CPU. Photographs of the workstation show numerous personal items that seem to be placed precariously on the workstation. Work materials under the workstation and on an adjacent desk were stacked in such a manner that it appears movement of the workstation was hindered, if not prevented.
Ms. Turner testified that she was able to access the rear of the CPU by reaching behind it while it was on the shelf. Mr. Roberts testified that he could access the rear of the CPU while it was on the shelf but he could not disconnect and remove the cables with the CPU on the shelf. The jury evidently found this explanation reasonable.
While the evidence revealed that Mr. Roberts knew of one other workstation within the department that had a movable shelf, the employee who worked at that station warned him of that fact before he began his work, and she held the shelf in place as he removed the equipment.
Under the evidence presented, we find the jury's determination that the workstation presented an unreasonable risk of harm to Mr. Roberts was reasonable.

Damages
Mr. and Mrs. Roberts complain that the jury's damage awards were inadequate. In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court determined that with regard to damages
[T]he discretion vested in the trier of fact is "great," and even vast, so that an *525 appellate court should rarely disturb an award of general damages.... It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn, 623 So.2d at 1261. If the appellate court determines that the jury's award is abusively low, it can only increase the award to the "lowest point which is reasonably within that discretion." Youn, 623 So.2d at 1260.
We have reviewed the record and find that the jury's total award of $11,000.00 for general damages is abusively low. Mr. Roberts suffered a neck injury, small central focal herniation at C4-5, which healed in approximately eight to nine months. He also suffered a broad-based herniated lumbar disc. Surgery was recommended in the event he could not tolerate the pain. He testified that he wanted to have the surgery, but that it had not been authorized by his employer's workers' compensation insurer as of trial. A review of cases in which similar neck and back injuries were at issue lead us to the conclusion that an award of $65,000.00 is the lowest award that was reasonably within the jury's discretion. See Sly v. Morris, 99-884 (La.App. 5 Cir. 1/25/00); 750 So.2d 1163; Baker v. Freeman, 97-604 (La.App. 3 Cir. 10/29/97); 702 So.2d 1140, writ denied, 97-2984 (La.12/10/97); 704 So.2d 1176.
The jury awarded $23,000.00 in past lost income and earning capacity. Mr. Roberts presented documentary evidence of his earnings prior to and at the time of his accident and expert medical evidence that he could not return to work because of his injury. Mr. Roberts' W-2 form for 1995 revealed that his earnings were $22,579.24; this represented income that he earned with his employer prior to his accident on September 6, 1995. Thus, the trial court's award of $23,000.00 was less than one year's salary for Mr. Roberts. We find this to be an abuse of the jury's discretion, considering the time period from the date of the accident to the time of the trial was two and one-half years.
Awards for past lost wages must be susceptible of mathematical calculation from documentary proof. Whitehead v. Kansas City Southern Ry. Co., 99-896 (La. App. 3 Cir. 12/22/99); 758 So.2d 211, writ denied, 00-209 (La.4/7/00); 759 So.2d 767. We calculate Mr. Roberts' lost income to be $82,607.10. This figure was calculated on the basis of Mr. Roberts' 1995 preaccident earnings of $22,579.24 as reflected by his W-2 form. An average monthly wage was determined based on the eight and two-tenths months that he worked before the accident. In turn, the average monthly wage was multiplied by the thirty months between the accident and the trial: $22,579.24 ÷ 8.2 months = $2,753.57 average monthly wage × 30 months of lost wages = $82,607.10.
Mr. Roberts also asserts that the jury committed error when it awarded only $4,500.00 for future loss of income or earning capacity.
The factors to be considered in determining future loss of income includes [sic] the plaintiff's physical condition before and after his injury, his past work record and the consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability he would have continued to earn wages over the balance of his working life.
Callihan v. Town of Vinton, 95-665, p. 8 (La.App. 3 Cir. 12/6/95); 668 So.2d 735, 741.
Dr. Jackson testified that in many cases like Mr. Roberts his patients can return to work within six weeks after surgery. He further testified that he expected Mr. Roberts to be able to return to sedentary work in two months. Based upon the average monthly wage of $2,753.57, the jury's *526 award of $4,500.00 represents approximately six weeks future lost earnings. Mr. Roberts did not present evidence that he would be unable to return to work as a computer repairman, or, if he returned to work in another field, that he would suffer a reduction in income following his surgery. Accordingly, we find no error with the jury's award of $4,500.00 for future loss of income or earning capacity.
Mr. Roberts next argues that the jury's award of $13,000.00 for future medical expenses was error. In Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5, 8 (La.App. 3 Cir.1991) (citations omitted), the proof required for an award of future medical expenses was addressed:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.
Dr. Jackson testified that his fee for the surgery would be $3,800.00 and that the hospital expenses would be approximately three times that amount. However, he further testified that he expected the hospital expenses to be a little less because insurers have reduced the number of days they approve for a patient to be hospitalized following this surgery. Dr. Jackson's testimony initially indicated total expenses of $15,200.00; this figure was qualified by his additional testimony that an insurer would only approve a shorter stay. Based on this testimony, we find no error with the jury's award.

Loss of Consortium
Mrs. Roberts appeals the jury's failure to award her damages for her loss of consortium claim. She testified regarding the effect of the accident and Mr. Roberts' injuries on their marriage. She testified that Mr. Roberts became depressed because he could not work after his accident. This was corroborated by Dr. Weiss. Mrs. Roberts did not work prior to Mr. Roberts' injury. Because Mr. Roberts' injury prevented him from returning to work, she had to go to work. This caused Mr. Roberts much concern and placed a great strain on their relationship. Their physical relationship was affected as a result of medication that caused some impotency problems for Mr. Roberts.
The State argues that the Roberts relationship was not as good as they claim because approximately three years before Mr. Roberts' injury, Mr. Roberts filed for a separation. The Roberts testified that the separation lasted only two days and that their relationship thereafter was a good, loving relationship. However, due to the stress and depression caused by Mr. Roberts' injuries, they separated twice after the accident.
The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.
Broussard v. Romero, 96-973, p. 12 (La. App. 3 Cir. 2/26/97); 691 So.2d 1265, 1273, writ denied, 97-670 (La.4/25/97); 692 So.2d 1092, quoting Rowe v. State Farm Mut. Auto. Ins. Co., 95-669, p. 25 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, 732, writ denied, 96-824 (La.5/17/96); 673 So.2d 611.
We find the jury's failure to award Mrs. Roberts damages for loss of consortium to *527 be an abuse of discretion. Considering the nature of Mr. Roberts' injuries, the impact of those injuries on his relationship with Mrs. Roberts, and the duration thereof, we find the amount of $2,500.00 to be the lowest amount that the jury could have reasonably awarded.

Assessment of Fault
The Roberts assign as error the jury's assessment of fifty-seven percent comparative fault to Mr. Roberts. An appellate court may reallocate fault only after finding an abuse of the jury's discretion and then only to the highest or lowest percentage of fault reasonably within the trial court's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985) the Louisiana Supreme Court set forth the manner in which the trier of fact is to assess fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff and considerations in determining the relative fault of the parties.
In applying these factors to this case, we find the jury did not abuse its discretion in assessing fault to Mr. Roberts. The State was at fault for placing a CPU on the movable shelf of a computer workstation without warning of the condition, eliminating the unreasonable risk of harm presented by the movable shelves by immobilizing them with a screw or nail, or placing the CPU on the desk top of the workstation, rather than the movable shelf. However, the record reveals that the jury's assessment of fault to Mr. Roberts is reasonably supported by the evidence. He had prior knowledge of at least one workstation with movable shelves and should have considered this possibility before he began removing the CPU at Ms. Turner's station. Mr. Roberts did not attempt to move the workstation forward before attempting to remove the CPU from the movable shelf. Additionally, he did not summon assistance from Ms. Turner or another OCS employee to move articles on, under, or adjacent to her workstation in order to access the CPU from the rear of the workstation. The jury's assessment of fault is reasonable.

Decree
In conclusion, we affirm the jury's determination of the State's liability and the assessment of fifty-seven percent comparative fault to Mr. Roberts. We amend the jury's award of damages to Mr. Roberts, increasing the award of general damages to $65,000.00 and the award for loss of past wages or earning capacity to $82,607.10. We reverse the jury's denial of damages to Mrs. Roberts and award her damages for loss of consortium in the amount of $2,500.00. The judgment is affirmed in all other respects. Costs are assessed to the State of Louisiana, through the Department of Social Services.
AMENDED IN PART; AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
WOODARD, J., dissents in part and assigns written reasons.
WOODARD, J., dissenting in part.
I agree with the majority's opinion in all respects except for the $2,500.00 loss of consortium award and I respectfully dissent from only that portion of the opinion. I agree that she was certainly entitled to an award, but that the amount of the award is not supported by any citation of *528 authority from a comparable case. The majority quotes the Broussard[1] case, in which the award was $10,000.00. The quote appearing in Broussard is from the Rowe[2] case. In Rowe, the court awarded $2,250.00 for loss of consortuim, because the evidence to support the award was minimal.[3] I believe the loss in this case to be greater than minimal and that the evidence supports an award between Broussard and Rowe of $7,500.00.
NOTES
[1] Broussard v. Romero, 96-973, p. 12 (La.App. 3 Cir. 2/26/97), 691 So.2d 1265, 1273, writ denied, 97-670 (La. 4/25/97), 692 So.2d 1092.
[2] Rowe v. State Farm Mut. Auto. Ins. Co., 95-669, p. 25 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, 732, writ denied, 96-842 (La. 5/17/96), 673 So.2d 611.
[3] Id.